782 So.2d 691 (2001)
STATE of Louisiana
v.
Kevin F. SHOLES.
No. 99-KA-2414.
Court of Appeal of Louisiana, Fourth Circuit.
March 7, 2001.
*692 Hon. Harry F. Connick, District Attorney, Orleans Parish, Juliet Clark, Assistant District Attorney, Orleans Parish, New Orleans, LA, Counsel for Plaintiff/Appellee.
Paula C. Marx, Louisiana Appellate Project, Lafayette, LA, Counsel for Defendant/Appellant.
*693 Court composed of Judge ARMSTRONG, Judge JONES and Judge LOVE.
ARMSTRONG, Judge.

STATEMENT OF CASE
On October 23, 1997, the defendant, Kevin F. Sholes, was indicted for the second degree murder of Walter McKay, in violation of La. R.S. 14:30.1. The defendant pled not guilty at his arraignment on October 28, 1997. The defendant filed suppression and discovery motions on November 19, 1997. After a motion hearing on March 18, 1998, the trial court denied defendant's motions to suppress evidence and identification. The defendant was found guilty as charged after a jury trial on November 12, 1998. The defendant filed a motion for new trial on December 1, 1998. The trial court denied the motion on the same day. The defendant waived delays. The trial court sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. The defendant's motion to reconsider sentence was denied. The trial court granted defendant's motion for appeal and set a return date of February 1, 1999.
On appeal defense counsel raises one assignment of error. Additionally, the defendant has filed a pro se brief in which he asserts three assignments of error.

STATEMENT OF FACT
At approximately 10:30 p.m. on September 3, 1997, Warren McKay was sitting outside his house on Laussat Place with his friend, Tyrone Jones. While he and Jones were talking, the defendant approached them and asked Warren where was his brother, Walter McKay. Warren told the defendant that Walter was inside the house. The defendant then went inside the house. A few minutes later, Warren heard a gunshot. He ran inside. The defendant told Warren that Walter had shot himself. The defendant then pushed Warren to the side and left the house. Warren heard gasping coming from the bedroom. He walked into the bedroom and saw his brother lying on the floor, bleeding. The witness turned over the mattress on the bed and found his brother's.38 caliber revolver. He took the gun and ran outside. Warren told Tyrone that they needed to get his brother to the hospital. He then ran after the defendant. While running, he borrowed a neighbor's phone and called the police. The witness, realizing he could not find the defendant, went home and put the gun away. Warren then stayed with the victim until the police arrived. The witness told the officers that the defendant shot his brother. He acknowledged that his brother was a drug dealer. He stated that the victim had several thousand dollars in the ceiling above the bedroom. However, that money was missing after the shooting. The next day, Warren found a .45 casing while cleaning the house. He turned it over to the police. The witness identified the defendant at trial and in a photographic lineup.
Tyrone Jones testified that at approximately 10:00 p.m., he picked up Warren McKay from his house and went for a ride. They came back about twenty minutes later. When they returned to Warren's house on Laussat Place, they sat on his car and talked. While they were sitting on the car, the defendant walked up and asked if they knew where the victim was at that time. Jones and Warren told the defendant that the victim was inside the house. The defendant then went inside the house. Shortly thereafter, Jones heard a gunshot. Warren jumped off the car and ran inside. The defendant came out of the house and said that the victim had been shot. Jones then went to call the *694 police. The witness noted that the defendant had his hands in his pockets when the defendant left the house. Jones identified the defendant at trial and in a photographic lineup. He acknowledged that he did not see the shooting.
Gerald Gillard, the victim's uncle, stated he was sleeping at the time of the shooting. He was awakened by the gunshot. As Gillard approached the bedroom, he observed the defendant leaving the house. The defendant had his hand in his pockets. The defendant did not say anything but made a face and then left the house. The witness identified the defendant at trial and in a photographic lineup. He also acknowledged that he did not see the shooting.
Dr. Paul McGarry, a forensic pathologist with the Orleans Parish Coroner's office, performed an autopsy on the victim. Dr. McGarry testified that the victim died from a single gunshot wound to the chest. The bullet entered the chest and passed through the left lung and pulmonary aorta, causing massive internal bleeding. He removed the bullet from deep tissue in the right upper back. Dr. McGarry stated that the wound was not consistent with a theory of suicide or a self-inflicted injury. Chemical tests revealed the presence of cocaine in the victim's body.
Officer Ricky Jackson responded to a call at 3057 Laussat Place at approximately 10:20 p.m. on September 3, 1997. When he arrived on the scene, he observed a black male lying on the floor in a bedroom. The subject had a gunshot wound to the chest and was bleeding profusely. The officer then notified an emergency medical unit. Officer Jackson secured the two witnesses in the house, Warren McKay and Mr. Gillard, until the homicide detectives arrived.
Det. Calvin Brazley, the lead homicide investigator, arrived on the scene shortly thereafter. When he arrived on the scene, he observed that the residence was a single-family dwelling. He went into the bedroom and noted that, in addition to the bed, there was a dresser, a chiffirobe and a television in the room. The victim was lying on the floor, on the right side of the bed. Emergency medical technicians were treating the victim. There was a large puddle of blood, with footprints in it, near the victim. Several drawers were missing from the dresser. A spoon was on top of the dresser. Small portions of crack cocaine were found in a couple of the dresser drawers. A sheet of paper with names and dollar amounts was found in the kitchen. A .45 caliber casing and two hundred twenty dollars were found on the scene. The officer obtained information concerning the defendant as a possible suspect. Det. Brazley obtained an arrest warrant for the defendant on September 4, 1997. The officer conducted photographic lineups with Warren McKay, Gerald Gillard and Tyrone Jones. All three men positively identified the defendant as the perpetrator. The witnesses also gave the officers statements concerning the shooting. Det. Brazley noted that no weapons were found on the scene. The officer learned that the victim had been involved in drug trafficking.
The parties stipulated at trial that if Officer Timmy Seuzeneux had testified at trial, he would have stated that he tested the .45 casing for fingerprints and found none.
A review of the record reveals no errors patent.

COUNSEL'S ASSIGNMENT OF ERROR NUMBER 1 AND DEFENDANT'S PRO SE ASSIGNMENT OF ERROR NUMBER 1
In these assignments, the defendant contends that the State failed to produce *695 sufficient evidence to prove that he was the person who shot and killed the victim. He argues that the circumstantial evidence is insufficient to meet the State's burden.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
The evidence presented by the State, although circumstantial, is sufficient to prove the defendant's guilt beyond a reasonable doubt. All three of the State's eyewitnesses testified that the defendant was inside the residence at the time of the shooting and left immediately afterwards. Warren McKay and Tyrone Jones testified that the gunshot was heard shortly after the defendant spoke with them and went into the residence. They stated that the defendant kept his hands in his pockets while talking with them. Warren McKay and Gerald Gillard further stated that the defendant had his hands in his pockets when he left the residence. Gillard testified that the defendant did not say anything to him but gave him a strange look before the defendant left. Warren McKay testified that the defendant told him that the victim had shot himself. However, Dr. McGarry specifically stated that the gunshot wound was not consistent with a theory of a self-inflicted injury. Warren McKay also stated that the defendant knew the victim kept a large sum of money in the bedroom and that the money was gone after the shooting. Despite the defendant's argument on appeal that another person could have been in the house, there was no testimony to that effect at trial. The witnesses testified that before the defendant arrived, the only two people in the house were the victim and Gerald Gillard, the victim's uncle. The testimony adduced at trial indicates that the defendant was the only person in the victim's presence when the victim was shot. Mr. Gillard testified that he was asleep and was awakened by the gunshot. When he walked out of his room, he saw the defendant standing in the house. No one else was in the house until Warren and Tyrone Jones ran in the house after the shooting.
This assignment is without merit.

DEFENDANT'S PRO SE ASSIGNMENT OF ERROR NUMBER 2
In this assignment, the defendant, pro se, contends that the trial court erred when it allowed the State to play the 911 tape for the jury. The trial court allowed the State to play the tape of the 911 call made by Warren McKay immediately after the shooting. The tape was played while McKay was on the witness *696 stand. McKay identified his voice on the tape.
La. C.E. art. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 402 provides that all relevant evidence is admissible; but, La. C.E. art. 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time. In determining the relevance of evidence, much discretion is afforded the trial judge. State v. Stowe, 635 So.2d 168 (La.1994).
In State v. King, 604 So.2d 661 (La.App. 1 Cir.1992), the defendant objected to the admission of a recording of the first two minutes of a 911 call on the grounds that the playing of the tape was unnecessary and repetitive because the persons whose voices were recorded on the tape were witnesses. The defendant further argued that the State was trying to gain the sympathy of the jury by playing the tape and that the prejudicial nature of the tape outweighed its probative value. The First Circuit held that the trial court did not err in admitting the edited version of the tape because that portion of the recording consisted of the basic report of the crime, including the number of shooting victims, the location of the incident, the efforts of the 911 personnel to calm the callers and a description of the perpetrators. The court noted that this portion of the tape also included the understandable excitement and emotional trauma from the occurrence in the voices of the callers. The remaining twelve minutes of the tape that were not played for the jury included first aid instructions from the 911 personnel, assurances from the 911 personnel that help was on its way, and crying and sobbing by the callers. The court stated that the tape was highly relevant in light of the defendant's attack on the credibility of the eyewitnesses and the alleged defect in their capacity to perceive the facts at the time of the shootings due to their alleged use of alcohol and/or drugs. The court further stated that the probative value of the tape clearly outweighed any danger of unfair prejudice.
In the case at bar, the 911 tape contained Warren McKay's first report of the shooting. The recording consisted of the basic report of the crime by the victim's brother. The defendant contends that the tape should not have been introduced because it contained the "distraught cries" of Warren McKay. However, the recording was relevant as to show the time and location of the shooting. As the First Circuit noted in King, the emotional trauma of the callers did not diminish the probative value and admissibility of the tape. The trial court did not abuse its great discretion in determining that the 911 tape was relevant evidence, and thus, admissible.
This assignment of error is without merit.

DEFENDANT'S PRO SE ASSIGNMENT OF ERROR NUMBER 3
In this assignment, the defendant, pro se, suggests that the trial court erred when it allowed the State to introduce prejudicial and gruesome photographs of the victim into evidence. The State attempted to introduce twenty-three photographs of the victim and the scene. The trial court allowed the State to introduce sixteen photographs of the victim and/or the crime scene, such as the bed and dresser in the bedroom. The particular photographs of which the defendant complains, State exhibit number four and *697 State exhibit number eight, are of the victim while still on the scene. Detective Brazley described State exhibit number four as a photograph of the victim's head and chest area. The victim was lying on the floor face up. The photograph was taken for identification purposes. The photograph shows the monitors placed on the victim's chest by the emergency medical technicians. The officer did not provide a description of State exhibit number eight, except that it was a photograph of the victim lying on the floor face up.
The admission of gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their probative value. State v. Bourque, 622 So.2d 198 (La.1993), appeal after remand, 699 So.2d 1 (La. 1997), cert. denied, Bourque v. Louisiana, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998), overruled on other grounds, State v. Comeaux, 699 So.2d 16 (La.1997), cert. denied, Comeaux v. Louisiana, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, Eaton v. Louisiana, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989). No error will be found unless the photographs are so gruesome so as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient other evidence. State v. Perry, 502 So.2d 543 (La.1986), cert. denied, Perry v. Louisiana, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987). The mere fact that a photograph is gruesome does not, in and of itself, render the photograph inadmissible. State v. Comeaux, 514 So.2d 84 (La.1987), appeal after remand, 699 So.2d 16 (La.1997), cert. denied, Comeaux v. Louisiana, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998).
Post-mortem photographs at the scene and autopsy photographs of a murder victim are admissible to prove corpus delicti, to provide positive identification of the victim, and to corroborate other evidence establishing the cause of death, the manner in which the death occurred, and the location, severity, and number of wounds. State v. Bourque, 622 So.2d at 236. The defendant cannot deprive the State of the moral force of its case by offering to stipulate to what is shown in the photographs. State v. Perry, 502 So.2d at 559.
In the case at bar, the photographs in question were introduced to provide positive identification of the victim and corroborate other evidence concerning the manner in which the victim was killed. The defendant has not shown that these photographs were unduly prejudicial.
This assignment is without merit.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.